**William P. WILSON, Plaintiff–Appellee,**

v.

**John G. WILSON, Thomas S. Wilson, and FSW, Incorporated, Defendants–Appellants.**

**No. 94–1985.**

United States Court of Appeals, Seventh Circuit.

Argued Oct. 25, 1994.

Decided Feb. 1, 1995.

Steven Popuch (argued), Thomas N. Swift, James J. Casey, Popuch & Associates, Chicago, IL, for plaintiff-appellee.

John L. Huff, Michael J. Gilmartin, Huff & Gaines, Cristofer E. Lord (argued), Chicago, IL, for defendants-appellants.

Before GOODWIN,* RIPPLE, and MANION, Circuit Judges.

MANION, Circuit Judge.

The plaintiff, William P. Wilson ("Bill"), brought suit against the defendants, alleging that the defendants, as trustees, had breached their duty to use reasonable care in managing various trusts of which Bill was a beneficiary. The parties appeared at a pretrial conference where the district court concluded on the record that the parties had reached an oral agreement to settle the underlying lawsuit. Following unsuccessful attempts to reduce this agreement to writing, Bill filed a motion to enforce the oral settlement agreement, which the district court granted. The defendants challenge the district court's decision to enforce the settlement agreement on the grounds that the parties had never entered into a legally binding agreement to settle the underlying lawsuit. We reject this contention and affirm the decision of the district court.

* Hon. Alfred T. Goodwin, of the Ninth Circuit, sitting by designation.

## I.

Francis S. Wilson, Jr., set up various trusts for the benefit of his wife, Kathryn W. Wilson, and his five children, including Bill Wilson. The trustees of these trusts included Bill's brothers, John G. Wilson ("Jack"), Thomas Wilson ("Tom"), and Francis S. Wilson, III ("Tug"), and Bill's cousin, David Wilson.

On December 29, 1989, Bill filed his initial complaint against Jack, Tug, and David Wilson, along with Philip E. Rollhaus, Jr., and Melvin L. Katten, alleging that these defendants, as trustees and/or former trustees, had breached their fiduciary duties in the management of the various trusts. Bill eventually settled his claims against Tug. Following this, Bill filed his amended complaint, asserting the same and additional claims, and adding Tom Wilson and F.S.W., Inc. (an investment management business in which Jack Wilson was an officer, shareholder and director) as additional defendants.

On September 4, 1992, counsel for both parties appeared before the district judge for a pretrial conference where they attempted to work out a settlement of Bill's claims. Jack and Bill Wilson were also present. The judge started off the conference by stating that the parties had reached a settlement agreement. At that point, neither Jack nor Bill, nor either party's counsel, contested that statement. The court then proceeded to lay out on the record the terms of that agreement: Defendants Jack, Tom and F.S.W., Inc. would transfer to Bill a combination of cash and property totalling $1.2 million. Specifically, Jack, Tom and F.S.W., Inc. were to pay over to Bill $500,000 in cash within 28 days of the hearing. In addition, both Jack and Tom were to transfer to Bill their combined interest in a real estate partnership, estimated to be worth approximately $700,000. The parties agreed that the court would appoint an independent appraiser to appraise the value of the partnership interest. If the appraised value of the partnership interest fell between $600,000 and $800,000, then no further consideration would be transferred to Bill. If, on the other hand, the appraised value came in either below $600,000 or above $800,000, then the court

stated, without objection from either party, that it would determine what additional assets were to be transferred to Bill, so that he would receive exactly $1.2 million. In exchange for these promises, Bill would forever be barred from bringing all claims against the defendants for any acts that gave rise to his suit. There was some quibbling between counsel over whether this latter objective of the agreement—Bill's promise not to sue—would be best served by adopting mutual releases or mutual covenants not to sue. However, the district court observed that as long as the parties agreed that there could not be any actions between the parties, then this objective would be part of the parties' settlement agreement, and it would be up to the parties' attorneys to demonstrate later to the court which legal form could best achieve that objective. Neither the attorneys nor the parties present raised any objection to this statement by the district court.

Following further discussions the court stated it was leaving it up to the parties' attorneys to reduce the specifics of their agreement to a written document. The court anticipated that some disputes would arise in drafting the specifics of the settlement agreement. However, the court unequivocally stated—again, without objection—that "[a]s far as I'm concerned, there is an agreement and nothing has to be signed." Indeed, when asked by Bill Wilson's attorney whether the parties could keep the trial date until a written agreement was signed by the parties, the district court rejected this request and repeated its earlier conclusion that the parties had nailed down an agreement.

Over the next three months, the parties argued back and forth about the specifics of their agreement without ever producing a mutually agreeable document. On December 8, 1992, Bill filed a motion with the district court seeking enforcement of the agreement he claimed was reached by the parties at the September 4th hearing. This motion was continued. Following additional negotiations between the parties, Bill, on February 19, 1993, filed a supplement to his earlier motion to enforce in which he reiterated his contention that the parties had entered into a binding settlement agreement at the September

4th hearing. On February 23, 1993, defendants filed a response in which they *joined* Bill's motion and *acknowledged* that the partied had entered into a settlement agreement on September 4, 1992. Defendants' main purpose in filing their response was simply to ensure that the settlement agreement entered into between the parties was not narrowed to exclude certain defendants from the agreement thus leaving them open to future suits.

Based on the parties' representations, the court, on January 7, 1994, directed Bill's attorney to prepare and submit a judgment order enforcing the parties' agreement. Defendants apparently began entertaining doubts about the settlement, for on January 11, 1994, defendants' counsel filed an emergency motion to strike Bill's motion to enforce the parties' settlement agreement. In their motion, defendants' principal contention was that since the parties had never reached a "meeting of the minds" over whether Bill and the defendants would exchange mutual releases or mutual covenants not to sue, there was never an intent to be bound and therefore no agreement to enforce. Therefore, defendants requested the court to conduct an evidentiary hearing on the issue of whether the parties had entered into an agreement. In the alternative, defendants claimed that subsequent correspondences from Bill's attorney indicated that Bill had repudiated any agreement reached by the parties.

That same day the parties appeared before the court on defendants' emergency motion. The court expressed its initial disagreement with the defendants' position, noting that everyone present at the September 4th hearing had agreed with the court's conclusion on the record that day that the parties had reached a settlement agreement. Nevertheless, the court told the defendants that it would review the transcripts of the September 4th hearing in determining whether the parties had reached an agreement.

On January 21, 1994, the district court entered an order in which it concluded that the parties had reached a settlement agreement on September 4, 1992. Accordingly, the court entered judgment of $1.2 million in favor of Bill and against Jack, Tom and F.S.W., Inc. The court further ordered that Bill would be barred from bringing any other claims against the defendants that had accrued on or before September 4, 1992. Finally, the court dismissed all of Bill's remaining claims against Jack, Tom and F.S.W., Inc. with prejudice and directed an entry of judgment pursuant to Fed.R.Civ.P. 54(b). The defendants sought reconsideration of this order, which the district court denied. We have jurisdiction over this appeal. 28 U.S.C. § 1291.

## II.

The central issue presented by the defendants is whether the district court incorrectly concluded that the parties had reached an oral settlement agreement at the September 4, 1992 hearing. Initially, we must ascertain the appropriate standard of review. Defendants assure us that the answer to this is found in a footnote contained in this court's decision in *Laserage Technology Corp. v. Laserage Laboratories, Inc.*, 972 F.2d 799 (7th Cir.1992). According to defendants, *Laserage* set forth two standards of review that are available when reviewing a district court's decision to enforce a settlement agreement. The first, a clearly erroneous standard, applies where the district court has accompanied its decision with explicit findings. The second, the *de novo* standard, applies in all other cases. Because the district court did not make findings regarding the existence of a settlement agreement, the defendants, as the parties challenging the judgment below, urge us to employ a *de novo* standard in reviewing the district court's decision.

However, a closer examination of *Laserage* indicates that the opinion contains no clear guidance on this matter. At one point in the footnote, the court intimates that a deferential review is appropriate, citing to our previous decision in *Merritt v. Faulkner*, 823 F.2d 1150 (7th Cir.1987) (*per curiam* ). Yet *Merritt* presents little foundation for this proposition. The relevant portion of *Merritt* states, without citation to authority: "We agree with the district court's determination (to which we show considerable deference)

that the agreement reached was a final settlement agreement." *Id.* at 1153. The only other authority cited in support of a deferential review, *Borne v. A & P Boat Rentals No. 4, Inc.*, 780 F.2d 1254 (5th Cir.1986), stated in passing, without authority, that a decision enforcing a settlement contained an "implied finding" of no material dispute which was not clearly erroneous. *Id.* at 1258. All told, these off-hand statements are too sparse to support a holding. However, without pursuing the matter further, the court in *Laserage* simply chose to review the matter *de novo* since even under that "more rigorous standard" the party challenging the judgment would still lose. *Laserage*, 972 F.2d at 803 n. 3. Therefore, this ambivalent language from *Laserage* does not provide us solid authority for our standard of review.

■ Our own research has revealed that the majority of the other circuits have addressed this issue. These circuits have uniformly stated that a district court possesses the inherent or equitable power summarily to enforce an agreement to settle a case pending before it. *See, e.g., Murchison v. Grand Cypress Hotel Corp.*, 13 F.3d 1483, 1486 (11th Cir.1993); *United States v. Hardage*, 982 F.2d 1491, 1496 (10th Cir.1993); *Brock v. Scheuner Corp.*, 841 F.2d 151, 154 (6th Cir. 1988); *Callie v. Near*, 829 F.2d 888, 890 (9th Cir.1987); *Mid–South Towing Co. v. Har-Win, Inc.*, 733 F.2d 386, 389, 390 (5th Cir. 1984); *Ozyagcilar v. Davis*, 701 F.2d 306, 308 (4th Cir.1983); *Autera v. Robinson*, 419 F.2d 1197, 1200 (D.C.Cir.1969). Consequently, some of these circuits have adopted the abuse of discretion standard when reviewing a district court's decision to enforce a settlement agreement. *See, e.g., Hardage*, 982 F.2d at 1495; *Callie*, 829 F.2d at 890. This makes sense. To the extent the court's power to enforce a settlement agreement falls within the court's role as supervisor of litigation, then, as noted by the Supreme Court in *Pierce v. Underwood*, 487 U.S. 552, 558 n. 1, 108 S.Ct. 2541, 2546 n. 1, 101 L.Ed.2d 490 (1988), this is precisely the type of determination that normally receives a deferential, abuse of discretion review. *See also* 1 Steven Alan Childress & Martha S. Davis, *Standards of Review* § 4.01A, at 4–2 (1986) (stating that a district judge's supervision of litigation is a judgment entailing on-the-scene presence and therefore entitled to deference). Therefore, we join with these other circuits and hold that the abuse of discretion standard is the proper guide for our review of a district court's decision to enforce a settlement agreement.

Having settled that, we note that these same courts have repeatedly cautioned that a district court may only enforce *completed* settlement agreements. *See, e.g., Murchison*, 13 F.3d at 1486; *Callie*, 829 F.2d at 890; *Ozyagcilar*, 701 F.2d at 308. These decisions uniformly hold that where the material facts concerning the existence or terms of an agreement to settle are in dispute, the matter must be remanded to the district court in order to conduct an evidentiary hearing. *Hardage*, 982 F.2d at 1496; *Mid–South Towing Co.*, 733 F.2d at 390; *Autera*, 419 F.2d at 1202–03; *see also TCBY Systems, Inc. v. EGB Assoc., Inc.*, 2 F.3d 288, 291 (8th Cir. 1993) (*per curiam*), *cert. denied*, —— U.S. ——, 114 S.Ct. 2104, 128 L.Ed.2d 665 (1994) (same); *Tiernan v. Devoe*, 923 F.2d 1024, 1031 (3d Cir.1991) (same).

The defendants attempt to fit their appeal within this analytical framework. Their principal objection is that the parties had never reached a "meeting of the minds" at the September 4th hearing with respect to Bill's part of the bargain. Specifically, defendants maintain that the parties never agreed on the exact terms of Bill's promise to drop his pending claims. Defendants claim that there are remaining unresolved matters, such as whether Bill would be barred from bringing all known or unknown claims against the defendants or only those of which Bill could have reasonably known, whether the parties would execute mutual releases or mutual covenants not to sue, and who would be covered by these releases or covenants. Defendants argue that the failure to finalize these terms creates a factual dispute over whether the parties ever reached an agreement. They insist these disputes require us to remand this case to the district court for an evidentiary hearing.

■ We are not persuaded by defendants' attempt to fit this case within that line of

decisions requiring an evidentiary hearing. First of all, in all of those decisions where the existence of an agreement was in dispute, the only evidence supporting an agreement was the affidavits and briefs of one party's counsel stating that the parties had reached an agreement outside the presence of the court. *See, e.g., TCBY Systems,* 2 F.3d at 289–90 (purported settlement agreement was the product of out-of-court correspondences between the parties' attorneys); *Hardage,* 982 F.2d at 1497 (same); *Callie,* 829 F.2d at 889–90 (same); *Autera,* 419 F.2d at 1200–01 (same). Obviously, under these circumstances some sort of hearing was necessary to pierce through the attorneys' conflicting affidavits and briefs and determine if the parties had in fact reached an agreement. Here, by contrast, the parties had reached a tentative agreement out of court and then appeared before the court to hash out the specifics of that agreement and have these confirmed on the record. As put by the district court at the hearing on the defendants' emergency motion to strike: "having reached the conclusion that there was a settlement in open court, I don't see why I need to have a hearing on something that was actually accomplished in open court." Thus, we find no abuse of discretion on the part of the district court in refusing to conduct a redundant hearing on what he perceived as a completed agreement achieved by the parties in open court.

Moreover, in those other decisions, the party challenging the existence of a settlement agreement raised this objection at the first available opportunity to the district court. In our case, the proper time for defendants to have challenged the existence of a settlement agreement was when the parties appeared before the court on September 4, 1992. Yet at no time during that hearing did defendants' counsel, or any of the defendants present in court, ever challenge the existence of a settlement, nor did they object to the court's conclusion twice on the record that the parties had reached a binding settlement agreement. What is more, five months later, in response to Bill's motion to enforce the settlement, the defendants filed a motion with the court in which they *joined* Bill's motion and *agreed* that a settlement

had been reached. Nearly a year went by after the defendants filed this motion without them ever once challenging the existence of an agreement. It was not until after the court ordered Bill's counsel to prepare and submit a judgment order that the defendants' counsel first alerted the district court that he wished to challenge the settlement's existence. This is simply too late.

This conclusion is in accord with the Fourth Circuit's decision in *Petty v. Timken Corp.,* 849 F.2d 130 (4th Cir.1988). There, the parties appeared in open court and stated on the record that a settlement had been reached. The district court dismissed the case without prejudice, and gave the parties sixty days in which to consummate the agreement. After it became clear that no agreement was forthcoming, the defendant filed an motion to enforce the settlement agreement reached in open court. In response, the plaintiff, represented by new counsel, filed a motion with the district court resisting enforcement apparently on the grounds that his previous counsel did not have authority to settle. Following a hearing on these motions, the district court granted the defendant's motion for enforcement. On appeal, the plaintiff argued that his claims of improper conduct on the part of original counsel cast a cloud over the validity of the settlement reached in open court and therefore the matter should be remanded for an evidentiary hearing. The Fourth Circuit acknowledged that a material dispute over an attorney's authority to settle, just like a dispute over the existence of an agreement, can require a district court first to conduct an evidentiary hearing. *Id.* at 132. The court, however, stated that it was undisputed that the parties had reached a settlement in open court, and that, even if the plaintiff's original attorney did not possess authority to settle, this could not be raised later to create a material question of fact regarding the validity of that settlement reached in open court. *Id.* at 133. As in *Timken,* the defendants here, both at the September 4th hearing and later in response to Bill's motion to enforce, represented to the district court that a binding settlement agreement *had* been reached. They cannot now raise eleventh-hour chal-

lenges in an attempt to create material issues of fact and derail a binding settlement reached in open court.

■■■■ Nor do we accept defendants' contention that no contract could exist as a matter of law. The parties agree that since the dispute in this case arose under Illinois law, whether or not a contract to settle was formed is also governed by Illinois law. In Illinois, "[a]n oral agreement to settle will be enforced as long as there is clearly an offer and acceptance of the compromise and a meeting of the minds as to the terms of the agreement." *Brewer v. National R.R. Corp.,* 256 Ill.App.3d 1083, 194 Ill.Dec. 834, 838, 628 N.E.2d 331, 335 (1993), *appeal allowed,* 155 Ill.2d 562, 198 Ill.Dec. 540, 633 N.E.2d 2 (1994). The transcript of the September 4th status hearing clearly demonstrates that the parties mutually agreed on the terms and scope of Bill's consideration. At that hearing, the district court recited on the record, without objection from the defendants, what he understood to be the parties' objective as to this portion of the settlement—namely, that Bill would be barred from bringing any claims against the defendants for any acts they may have taken that gave rise to Bill's lawsuit. Nor is there any question over who was covered by Bill's promises, for the transcript reveals that the parties agreed that Bill's releases would extend to Jack Wilson, Tom Wilson, Francis Wilson, Kathryn Wilson, and F.S.W., Inc. As to the scope of this release, the district court stated on the record, once again without objection from the defendants, that the objective of the parties' agreement was that "there cannot be suits between the parties for actions arising prior to this date." This language is broad enough under Illinois law to include all potential claims by Bill that the defendants were seeking to prevent. *Cf. Rakowski v. Lucente,* 104 Ill.2d 317, 84 Ill.Dec. 654, 657, 472 N.E.2d 791, 794 (1984) (noting that a broad, general release is sufficient to exclude specific claims). That being the case, it mattered not whether this was a mutual release or a mutual covenant, for, as stated above, the bottom line was that the parties agreed that Bill was

barred from bringing suit against the defendants.[1] Thus, from our review of the September 4th transcript, we are satisfied that the parties had mutually agreed that Bill would drop all of his claims against the defendants, which is certainly enough of a return promise to the defendants to constitute sufficient consideration to support this settlement agreement. *See, e.g., Wilson v. Hoffman Group, Inc.,* 131 Ill.2d 308, 137 Ill.Dec. 579, 585, 546 N.E.2d 524, 530 (1989) ("Generally, anything of detriment to one side, or benefit to the other, may constitute sufficient consideration to support a settlement."); *Goodwine State Bank v. Mullins,* 253 Ill. App.3d 980, 192 Ill.Dec. 901, 924–25, 625 N.E.2d 1056, 1079–80 (1993), *appeal denied,* 155 Ill.2d 563, 198 Ill.Dec. 542, 633 N.E.2d 4 (1994) (mutual promises constituted consideration for an agreement).

Defendants' next claim is that even if there was a meeting of the minds, the fact that the parties never agreed on the legal forms of the releases renders this agreement too indefinite to be enforceable. In making this argument, defendants rely upon our decision in *United States v. Orr Const. Co.,* 560 F.2d 765 (7th Cir.1977). In *Orr,* the parties drafted a settlement agreement, which included a requirement that both sides exchange the "proper legal releases." The parties were unable to come up with mutually acceptable releases, and after months of negotiations, the plaintiffs filed a motion to enforce the written settlement agreement. The district court granted the plaintiffs' motion, finding that the phrase "proper legal releases" simply meant that each party would exchange customary forms of releases within the parties' respective industries. We disagreed and reversed the district court. In our view, it was impossible to attach a fixed meaning to the phrase "proper legal releases," either through an objective analysis of the language or the parties' subjective intent as manifested by their conduct following execution of the agreement; this made the term "proper legal releases" hopelessly indefinite. This, in turn, rendered the entire settlement contract unenforceable. *Id.* at 770–72.

---

[1]. And thus against their heirs and assigns, for such persons' liability is derivative. *See* E. Allan

Farnsworth, *Contracts* § 11.8 at 809–10 (2d ed. 1990).

■ For starters, *Orr* has no application to this case. *Orr* was a case involving an attempted settlement of a claim arising under federal law.[2] *Orr* made it clear that "when federal law governs the substantive rights of the parties and provides the basis on which the parties were able to bring the matter into federal court ... enforceability of the [settlement] agreement must be decided as a matter of federal law." *Id.* at 769. And since as previously indicated, Illinois law controls this dispute, there is no need to resort to federal law. Under Illinois law "[a] contract is sufficiently definite and certain to be enforceable if the court is enabled from the terms and provisions thereof, under proper rules of construction and applicable principles of equity, to ascertain what the parties have agreed to do." *Academy Chicago Publishers v. Cheever*, 144 Ill.2d 24, 161 Ill.Dec. 335, 337, 578 N.E.2d 981, 983 (1991) (quotations omitted) (citations omitted). As indicated in our previous discussion, there can be no doubt over what the parties in open court had agreed to do: Bill would drop all of his claims against the defendants in exchange for their offer to settle his claims for $1.2 million. That the parties did not specify the legal form of Bill's promise is of no consequence; the fact is that after the September 4th hearing the parties had an objective basis for determining when either party had breached the oral settlement agreement. No more is required to overcome a challenge to a contract's enforceability due to alleged indefiniteness. *See Academy Chicago Publishers*, 161 Ill.Dec. at 338, 578 N.E.2d at 984.

■ Defendants raise other arguments, yet these deserve only brief discussion. For instance, the defendants claim that subsequent to the September 4th hearing, Bill's attorney sent defendants a letter in which he allegedly repudiated the settlement agreement reached by the parties. Yet this court long ago made it clear that "a settlement agreement or stipulation voluntarily entered into cannot be repudiated by either party and will be summarily enforced by the Court." *Cummins Diesel Michigan, Inc. v. The Falcon*, 305 F.2d 721, 723 (7th Cir.1962) (collecting Illinois cases); *see also Schneider v. Dumbarton Developers, Inc.*, 767 F.2d 1007, 1015 (D.C.Cir.1985) (same); *Autera*, 419 F.2d at 1201 n. 17 (citing, among other authorities, this court's decision in *Cummins* as authority for the proposition that "a valid settlement agreement, once reached, cannot be repudiated by the parties"). The defendants also claim that their trial counsel (we are not sure if this same attorney is still retained by the defendants) lacked authority to reach a settlement agreement. However, this claim was not presented until the defendants' motion to reconsider the district court's order enforcing the settlement agreement, which means that it is waived for purposes of this appeal. *See Laserage*, 972 F.2d at 804 (raising an argument for the first time in a motion for reconsideration "is too little, too late."). Lastly, the defendants complain that the district court improperly required the defendants to pay $1.2 million in cash when they only agreed to transfer a combination of cash and the real estate partnership interest. However, this argument was also not raised until the defendants' motion to reconsider and is accordingly waived. Moreover, it is clear from reading the transcript of the September 4th hearing that the defendants had agreed to allow the district court to transfer different assets to Bill in order to effectuate the defendants' side of the agreement. Thus, a total cash settlement was certainly within the scope of what the defendants had agreed to pay over to Bill.

### III.

We have examined the transcript of the September 4, 1992 hearing and agree with the district court's determination that the parties on that date entered into a binding and enforceable agreement to settle Bill's claims. Therefore, we AFFIRM the district court's order enforcing that agreement.

---

**2.** The plaintiff sought relief under the Miller Act, 40 U.S.C. §§ 270a, 270b. *See Orr*, 560 F.2d at 767.